IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAUREL M. COTE : | |
| : | |
| **Plaintiff** : | |
| : | |
| v. : | No. 3:14-cv-01644-VAB |
| : | |
| UNITED OF OMAHA LIFE INSURANCE : | |
| COMPANY : | |
| : | |
| **Defendant.** : | |

**RULING ON PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Laurel M. Cote has sued Defendant United of Omaha Life Insurance Company ("Omaha") for breach of contract, alleging that Omaha wrongly canceled the life insurance policy ("the Policy") that it issued to her husband, Caroll Cote, in 2011.

Defendant advised the Plaintiff that it was rescinding Mr. Cote's policy in August 2013, after Omaha determined that Mr. Cote had misrepresented his medical history in his application for life insurance. Ms. Cote then filed an action for breach of contract in Connecticut State Court on October 9, 2014 and Defendant removed the case to this Court on November 4, 2014. *See* Notice, ECF No. 1. On July 15, 2016, both parties moved for summary judgment. For the reasons that follow, both motions are DENIED.

**I. Factual Background[1]**

On September 19, 2011, Mr. Cote applied for a $150,000 life insurance policy from United of Omaha for mortgage protection. Def.'s L.R. 56(a) Stmt., ECF No. 59, ¶ 1. He completed a

---

[1] The relevant facts are taken from Defendant's Local Rule 56(a)(1) Statement and Exhibits attached to the Local Rule 56(a)1 Statement, ECF No. 59, as well as an Affidavit from Dr. Dickman, which Defendant submitted as ECF No. 58. The relevant facts are also taken from Plaintiff's Local Rule 56(a)(1) Statement and attached Exhibits, ECF No. 55. The Court also draws from Defendant's Local Rule 56(a)(2) Statement, filed as ECF No. 62-1, and Plaintiff's Local Rule 56(a)(2) Statement, filed as ECF No. 61. *See* D. Conn. L. Civ. R. 56(a).

1

supplemental application regarding his health on September 27, 2011. *Id.* at ¶ 2.  Question 3(h) of this application asked if he had "ever (a) received treatment for, or (b) been advised by a member of the medical profession to seek treatment regarding: cancer, tumor, […or a] blood/bleeding disorder." *Id.* at ¶ 3.  The application also required Mr. Cote to "immediately notify" United of Omaha any time he experienced a "change in health or habits" that would change his answers to any of the questions on the Application.  *Id.* at ¶ 4.

After processing Mr. Cote's application, Omaha issued the Policy on October 6, 2011.  *Id.* at ¶ 5.  Mr. Cote was diagnosed with Leukemia in January, 2012. *Id.* at ¶ 6.  He passed away on December 29, 2012. *Id.* at ¶ 7.  Because he died within two years of obtaining the Policy, Omaha did a standard review of his application.  *Id.* at ¶ 8.  During this review, Omaha discovered that doctors had reported two issues with Mr. Cote's blood—thrombocytopenia (low platelet count in his blood) and anemia (low red blood cell count)—at appointments between May and September of 2011. *Id.* at ¶ 10.  Omaha rescinded the Policy in a letter to Plaintiff Laurel Cote on August 6, 2013.  *Id.*  Omaha claimed that Mr. Cote had made a material misrepresentation, which warranted rescission, by answering "no" to Question 3(h) of the Policy questionnaire.  *Id.*  In October 2014, Ms. Cote sued Omaha for breach of contract.  *See* Not. of Removal, ECF No. 1., ¶ 2.

A. **Mr. Cote's Medical History**

The record reveals that Mr. Cote met with two of his doctors, Dr. Kevin D. Dieckhaus and Dr. Stanley Babu, to discuss abnormal blood test results in the spring of 2011.  *See* Pl.'s L. R. 56(a) Stmt., ECF No. 55, ¶¶ 1-3; Def.'s L. R. 56(a) Stmt., ¶¶ 24-25.  In early 2011, Mr. Cote had an operation on his leg after falling from a tree in early 2011.  Pl.'s L.R. 56(a) Stmt., ¶ 3.  After this operation he developed an infection that required intensive treatment.  *Id.* at ¶ 4.  At this point, he started to see an infectious disease specialist, Dr. Dieckhaus, to monitor the infection. *Id.* at ¶ 3.

1. **Treatment by Dr. Dieckhaus in 2011**

Dr. Dieckhaus did "bloodwork" for Mr. Cote on July 13, August 12, and September 9, 2011 and discovered that Mr. Cote had anemia and thrombocytopenia. Pl.'s L.R. 56(a) Stmt. ¶ 9-12. Dr. Dieckhaus believed that the blood conditions might have been caused by Mr. Cote's consumption of Bactrin, a strong antibiotic that he had been taking to treat the infection on his leg. *Id.* at ¶ 7.

Dr. Dieckhaus' medical records confirm that he disclosed the results of Mr. Cote's blood tests to Mr. Cote and his wife at an August 22, 2011 appointment. Pl.'s L.R. 56(a) Stmt. ¶ 12. The records state that "Mr. Cote and his wife appeared to be well aware of the potential risks and benefits of continued antibiotics versus stopping them and he is willing to attempt a trial of lower dose antibiotic with supplementation of his folate." *Id.* at 14 (citing Dieckhaus Medical Report, Ex. B to Dickman Aff., ECF No. 58-2) ("Dieckhaus Medical Report"). Dr. Dieckhaus prescribed folate to Mr. Cote and scheduled another blood test on September 6, 2011. *Id.* at 19-20. His notes from the meeting state "I am concerned regarding [Mr. Cote's] blood work, which is now showing a decrease in his platelet count…. After extensive discussion, we have opted to reduce [Mr. Cote's] Bactrin." Dieckhaus Medical Report, 1.

At an appointment with the Cotes on September 28, 2011, Dr. Dieckhaus explained the results of the September 6 blood test. He explained that Mr. Cote's platelet count had dropped to a dangerous level. Pl.'s L.R. 56(a) Stmt. ¶ 19. He mentioned to the couple that it was a "critical problem" and a "big issue that needed to be addressed." *Id.* at ¶ 36; *see also* Def.'s L.R. 56(a) Stmt. ¶¶ 20-21. A summary of the meeting in Dr. Dieckhaus's records confirms that Dieckhaus "suspected" that Mr. Cote's thrombocytopenia was due to his dosage of antibiotics. Dieckhaus Medical Report II, Ex. F to Dickman Aff., ECF No. 58-7. Dr. Dieckhaus recommended discontinuing the antibiotics and arranged for Mr. Cote to take weekly blood tests to assess his platelet levels. *Id.*

The record does not make clear whether Dr. Dieckhaus used the word "disorder" when describing Mr. Cote's blood problems. Dr. Dieckhaus did state that he had "no reason to believe"

3

that anyone had told Mr. Cote that he had a "blood disorder." Dieckhaus Dep. 93: 1-5 ("Q. As you sit here today, do you have any reason to believe that Mr. Cote had been told by anybody that blood disorder was a possible problem for him in September or October of 2011? A. No."). He also stated that he "probably would not have" used the word "disorder" to describe Mr. Cote's test results. *Id*. at 121: 16-19 (responding to a question asking "Do you know if you would have used the word "disorder" in connection with describing those low blood values?).

### 2. Treatment by Dr. Babu in 2011

Mr. Cote met with a primary care physician, Dr. Babu, for a pre-operation physical on May 10, 2011. Def.'s L.R. 56(a) Stmt., ¶ 11. Dr. Babu reviewed Mr. Cote's blood tests at this appointment and diagnosed him with anemia. Pl.'s L.R. 56(a) Stmt., ¶ 34, He also reviewed Mr. Cote's blood work again on September 30, 2011, at a "health maintenance evaluation" of Mr. Cote. Pl.'s L.R. 56(a) Stmt., ¶ 26; Def.'s L.R. 56(a) Stmt., ¶ 25. Dr. Babu's notes from this meeting describe a diagnosis of anemia and thrombocytopenia. Def.'s L.R. 56(a) Stmt., ¶ 25 (citing Babu Medical Report, Ex. G, Dickman Aff., ECF No. 58-7) ("Babu Medical Report"). Dr. Babu's notes further state that Mr. Cote's anemia was "asymptomatic" and that he was taking iron supplements and "doing well." Babu Medical Report, 1. Under the "thrombocytopenia" diagnosis, Dr. Babu noted that the "etiology [was] unclear at this time" and wrote "recheck again." *Id.* at 3. At the appointment, Dr. Babu told the couple that Mr. Cote's throbocytopenia might have been caused by his antibiotics or by a different condition called idiopathic thrombocytopenic pupura (ITP). Def.'s L.R. 56(a) Stmt., ¶ 28. He asked Mr. Cote to get more blood tests. He also did not use the word "disorder" at the appointment. Pl.'s L.R. 56(a) Stmt., ¶ 39; Babu Dep. 69: 7-13 ("Q. Okay. Do you have any recollection of ever telling Carroll Cote that he had a blood disorder? A. Never. Q. If you had told him he had a blood disorder, would you have made note of that in any of your charts or records? A. I would have.").

B. **Evidence of Mr. Cote's "Blood Disorder"**

The record contains statements from both doctors clarifying their understanding of the term "blood disorder." In response to a question about thrombocytopenia, Dr. Babu stated that he considered the condition to be a "lab result" rather than a "blood disorder. Babu Dep., 69: 4-13 ("Q. Do you consider that a blood disorder or simply a symptom, a lab result? A. A lab result"). Dr. Babu stated that anemia was a "low blood count" rather than a disorder. Babu Dep. 20: 7-9 ("Q. Okay. And what is anemia? A. A low blood count.").

Dr. Dieckhaus also stated that he would not necessarily use the word "disorder" to describe either condition. At his deposition, Dr. Dieckhaus stated:

> anemia is more of a sign.  It's usually indicating of a pathologic process that's underlying it. Same with the platelet counts, it's a sign that indicates a pathologic process that's driving it. … [Anemia and thrombocytopenia are] both descriptors of a level of a certain blood component.  The diagnosis in my mind is what drives that level. So, for example, anemia may be from blood loss, so a hemorrhage, that's the diagnosis.

Dieckhaus Dep., Def.'s L.R. 56(a) Stmt., Ex. 1, ECF No. 54-1, 98:8-13; *see also id.* at 99:22-25 ("It's usually anemia is secondary to X, Y, and Z.  Thrombocytopenia is secondary to X, Y, or Z.  And it's incumbent on the treater to identify what X, Y, and Z are.")  When asked to give examples of blood disorders, Dr. Dieckhaus stated: "things like sickle cell anemia, things like thalamus anemia, leukemia, lymphoma, that sort of thing." *Id.* at 97: 24-25. He further explained that "anemia has a bunch of varieties.  So, iron deficiency anemia, thalamus anemia… I should have been more specific. It's more based on the pathological process." *Id.* at 100: 17-22.

II. **Standard of Review**

Summary judgment shall be granted when "the pleadings, depositions, ... and admissions on file, ... show that there is no genuine issue as to any material fact and that the moving parties are entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When reviewing a motion to dismiss, the Court must draw all reasonable inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255.

### III. Discussion

"Under Connecticut law, an insurance policy may be voided by the insurer if" the insurer "prove[s] three elements: (1) a misrepresentation (or untrue statement) by the plaintiff which was (2) knowingly made and (3) material to [the insurer's] decision whether to insure." *Pinette v. Assurance Co. of Am.*, 52 F.3d 407, 409 (2d Cir. 1995). The parties dispute the first two elements.[2] United of Omaha rescinded Mr. Cote's life insurance policy because it believed that Mr. Cote made a material misrepresentation to the company when he answered Question 3(h) in the negative and when he did not inform the company of his "change in health." Def.'s Mem., ECF No. 54, 8. In other words, the parties disagree about whether Mr. Cote made a knowing misrepresentation when he answered Question 3(h) and when he failed to correct his answer to Question 3(h) after learning more about his thrombocytopenia and anemia in September 2011.

---

[2] As Defendant notes, Plaintiff does not dispute that the alleged misrepresentations were "material to the risk." Def.'s Reply Br., ECF No. 63, 6. Defendant has stated tha its "claim investigation and underwriting guidelines confirm that if the company was aware of the condition of Mr. Cote's blood … the policy would not have been approved and issued." Def.'s Mem., ECF No. 54, 12. The Court presumes that Mr. Cote's answer to Question 3(h) was "material" to Defendant's decision to issue his insurance policy. *See Pinette*, 52 F.3d at 411 ("Connecticut caselaw strongly suggests that an answer to a question on an insurance application is *presumptively* material,"); *see also Great Am. Ins. Co*., 607 F.3d at 295 ("[Because the insured's] prior losses were the subject of specific inquiry, [the insured's] response is presumptively material.")

6

The Court disagrees with both parties. A reasonable jury could conclude that Mr. Cote either did or did not knowingly misrepresent his health to United of Omaha. For this reason, neither party is entitled to summary judgment.

### A. Defendant's Motion for Summary Judgment

Defendant argues that it properly rescinded the Policy because Mr. Cote "knew about his blood disorders and failed to disclose them" to United of Omaha and thus knowingly misrepresented his answer to Question 3(h). Def.'s Mem., 1. The Court disagrees. A genuine dispute remains concerning several facts that are material to this case: namely, whether Mr. Cote's answer to Question 3(h) amounted to a misrepresentation and, if so, whether Mr. Cote "knowingly" made the misrepresentation.

#### 1. Misrepresentation

An insured party's "material misrepresentation" can "render a contract voidable under Connecticut law." *Pinette*, 52 F. 3d at 409-410. When an insured was honestly mistaken in answering a question, however, his or her answer "may be considered a true one in response to the question as he understood it" and does not amount to a misrepresentation, even if it was technically wrong. *Middlesex Mut. Assur. Co. v. Walsh*, 218 Conn. 681, 694-96 (1991) (citing 7 Couch on Insurance§ 35:145). In other words, if an insured "could reasonably have understood the question as calling for a particular response, and the response given in accordance with that understanding is not false, the response does not amount to a misrepresentation." *Id.*

The parties dispute whether Question 3(h) unambiguously required Mr. Cote to report his anemia and thrombocytopenia. Plaintiff argues that anemia and thrombocytopenia are not "blood disorders," citing testimony from Drs. Dieckhaus and Babu. Pl.'s Mem., ECF No. 57, 7; Pl.'s Opp. Mem., ECF No. 60, 2. Defendant counters that "'disorder' is broadly defined," citing a dictionary definition of "a condition characterized by lack of normal functioning of physical and mental processes." Def.'s Mem., 7 (citing American Heritage Dictionary (5th Ed. 2015)).

In determining whether Mr. Cote responded falsely to Question 3(h), the Court "must construe the question as a lay person would understand it." *Walsh*, 218 Conn. at 694 (citing *Cody v. Remington Electric Shavers*, 179 Conn. 494, 497 (1980)); *see also Holy Trinity Church of God in Christ v. Aetna Casualty & Surety Co.*, 214 Conn. 216, 223-24 n. 5 (1990) ("[I]f the inquiry is so framed that it does not clearly inform the insured of its meaning, and he may have been honestly mistaken as to what was intended, and his answer, by fair and reasonable construction, may be considered a true one in response to the question as he understood it, such interpretation will be given, and a forfeiture precluded."). In *Walsh*, the insured had not listed his 39-year old son in response to a question from his auto insurance company about "all children in [his] household." *Walsh*, 218 Conn. at 690. The court reviewed dictionary definitions that "indicate[d] that a "child" most commonly means a person under the age of majority," meaning that "Walsh could reasonably have understood the question as inquiring whether any underage person lived in his household." *Id.* at 695. Therefore, the court concluded that Walsh's response did not amount to a misrepresentation.

As *Walsh* suggests, courts can use dictionaries or other commonly used sources to assess whether an insured could have "reasonably attached" a certain meaning to a question in an insurance form. In addition to the American Heritage Dictionary, which Defendant cites, other dictionaries imply that the term "disorder" has a broad meaning. Merriam-Webster's online dictionary defines "disorder" as "an abnormal physical or mental condition." *Disorder*, Merriam-Webster Dictionary (online ed. 2017), *available at* https://www.merriam-webster.com/dictionary/disorder.

While the term "disorder" may have a clear definition, the term "blood disorder" is more ambiguous. Mr. Cote's doctors both testified that they did not understand Mr. Cote's anemia or thrombocytopenia as "blood disorders." Pl.'s L. R. 56(a) Stmt. ¶ 33. Specifically, both doctors portray the conditions as descriptions of lab results, rather than "disorders" in themselves. Dr. Dieckhaus said that he would call anemia and thrombocytopenia "descriptors of a level of a certain blood component." Diekhaus Dep., 100:8-13. As both parties note, Dr. Diekhaus stated that he,

8

when describing Mr. Cote's thrombocytopenia or anemia, "would probably say [to the Cotes that] 'the blood test came back with some low values." *Id.*, 121: 9-10.  Dr. Dieckhaus added that the fact that the blood test came back with low values, and his "interpretation" that the platelet count was related to his antibiotics, was "the more important thing." *Id.*  Dr. Babu also agreed that it would be "fair to say that [he] would not tell a patient with thrombocytopenia that it was a blood disorder." Babu Dep., 69: 4-8.

In many cases, the phrasing of the insurance contract makes clear the exact parameters of the question asked, such that an incorrect answer is likely a misrepresentation.  A "court will not torture words to import ambiguity, where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings." *Downs v. National Casualty Co.*, 146 Conn. 490, 494-95 (1959); *Kelly v. Figueiredo*, 223 Conn. 31, 37 (1992) (internal quotation marks omitted.) ("The fact that the parties advocate different meanings of the … clause does not necessitate a conclusion that the language is ambiguous."). In *Coassin*, which Defendant cites, the court found that the insured defendant had misrepresented his answer to Question 18J of his life insurance policy, which read: "In the last ten years, have you had, been treated for or diagnosed as having ... any disease or disorder of the eyes, ears, nose, throat or skin?" *Principal Nat'l. Life Ins. Co. v. Coassin*, No. 3:13CV1520 (JBA), 2015 WL 5680320, at *1 (D. Conn. Sept. 25, 2015).  The court refused to accept Mr. Coassin's argument that Question 18J was ambiguous because the plaintiff insurance company had clarified Question 18J in an amendment listing specific symptoms, including "dizziness, lightheadedness and vertigo." *Id.* at *4.  Given the language of the Amendment, the *Coassin* court found Mr. Coassin's reading of Question 18J was "not plausible, let alone reasonable." *Id.*  ("While it is true that Question 18J asked specifically about disorders of the eyes, ears, nose, throat or skin, the Amendment was broader.").

In this case, the Policy's reference to "blood/bleeding disorders" was ambiguous.  Unlike the plaintiff insurance company in *Coassin*, Omaha did not clarify its use of the word "disorder" with an

9

amendment listing specific symptoms or conditions. *See Coassin*, 2015 WL 5680320, at *4. There is a "plausible" and "reasonable" definition of the term "blood disorder" that would not include Mr. Cote's thrombocytopenia or anemia, which, as Mr. Cote's doctors explain, are often considered symptoms of disorders rather than disorders themselves. *Id.* While Defendant is correct that "Mr. Cote was told in plain and straightforward language that he was suffering from problems with his blood," Mr. Cote may have reasonably believed that he did not have a "blood disorder." *See* Def.'s Reply, ECF No. 63, 1.

If a question on an insurance form is ambiguous, the court should construe the ambiguity in favor of the insured. *Walsh*, 218 Conn. at 696 ("if Middlesex had intended the question to elicit a response disclosing the sons or daughters of any age living in Walsh's household so that it could ascertain the 'potential driving exposures,' ... it could have expressed that intent in a question drafted with greater precision."). Both parties' submissions make clear that a genuine issue of material fact remains about whether Mr. Cote's answer to Question 3(h) was a misrepresentation.

### 2. Knowing Misrepresentation

Even if Question 3(h) was so unambiguous that Mr. Cote's answer constituted a misrepresentation, it is unclear whether the alleged misrepresentation was "knowingly made." *Pinette*, 52 F.3d at 409. Defendant argues that Mr. Cote "knew in September 2011 that his answer to Question 3(h) … was not true." Def.'s Mem., 16. The Court disagrees. Genuine issues of material facts remain as to whether Mr. Cote knew that he had been treated for a blood disorder, or was justifiably unaware of that fact.

A response to a question on an insurance application does not constitute a misrepresentation unless it is "knowingly false." *Walsh*, 218 Conn. at 697 ("[W]e have rejected the line of authority holding that innocent misrepresentations are sufficient to void a life insurance policy"). The law, however, requires an insured to "use reasonable diligence to see that the answers are correctly written." *Pinette*, 52 F.3d at 409-10. Misrepresentations "made because of ignorance, mistake, or

10

negligence," are not considered "innocent." *Id.* (citing *Walsh*, 218 Conn. at 691-92). For this reason, "a person may not claim that a misrepresentation is `innocent' solely because the person failed to read the application before signing it," *Pinette*, 52 F.3d at 410, or because he or she was in "a drug and alcohol-induced 'fog'" when completing the application. *Mt. Airy Ins. Co.*, 928 F. Supp. at 176.

Furthermore, an insured party may not benefit from a misrepresentation that directly contradicts a fact that would have been obvious to the party at the time. *Coassin*, 2015 WL 5680320, at *5. In *Coassin*, the Court held that the insured defendant's misrepresentations were "knowing" because he had seen two doctors only weeks before signing a supplement to his insurance application, in which he responded "no" to a question asking "[h]ave you had any illness or injury or consulted a member of the medical profession since the date of the application?" *Id.*; *see also Murtha*, 2001 WL 256145, at *1 (granting summary judgment for insurance company when the plaintiff "indicated that he had not received any medical advice or treatment in the past six months, … failing to disclose the treatment he received earlier that same day.").

Nevertheless, the law does not hold insured parties responsible for a misrepresentation when they were "justifiably unaware of its falsity." *Mt. Airy Ins. Co.*, 928 F. Supp. at 175; *Murtha v. Golden Rule Ins. Co.*, No. CIV.A.3:98-CV-975JCH, 2001 WL 256145, at *4 (D. Conn. Mar. 5, 2001) ("When Connecticut courts speak of 'innocent' misrepresentations, they generally have in mind the situation in which the applicant does not know that the information he is providing is false.").

An insured patient can justifiably rely on representations from his or her doctor when making statements to an insurance company. *Vella v. Equitable Life Assur. Soc. of U.S.*, 887 F.2d 388, 389 (2d Cir. 1989) (applying New York law). In *Vella*, a doctor "told [the insured] that he was not really suffering from [chest pains] but was, instead, experiencing nothing more than anxiety." *Id.* The appeals court approved of the trial court's finding that the insured did not make a misrepresentation when he reported to the life insurance company "no indication" of chest pains or dizziness. The court concluded that Vella did not make a material misrepresentation to his insurance company. *Id.*

at 392. "The doctor told him he was fine," the court reasoned, "thus Vella was correct in saying he had had no illness." *Id.; see also Lewis v. John Hancock Mutual Life Ins. Co.*, 443 F.Supp. 217, 218 (D.Conn.1977) ("[A]n insured makes a knowing misrepresentation only when he submits an answer to a question in the application other than that which he has reason to believe is true.").

Like the plaintiff in *Vella*, Mr. Cote had reason to believe that his answer to Question 3(h) was true. This is not a case like *Coassin*, where the insured party's statement obviously and directly contradicted his own past experience. Mr. Cote's doctors did not give him a reason to believe that he had a "blood/bleeding disorder," since neither doctor told him that his blood conditions, which arose from problematic lab results, were "disorders." Ms. Cote testified that she and her husband answered "no" to Question 3(h) because they did not believe Mr. Cote had a "blood/bleeding disorder." Cote Dep., Pl.'s L. R. 56(a) Stmt., Ex. 2, ECF 55-3, 40: 1-11. Plaintiff further emphasizes that Mr. Cote was forthright and honest in completing the rest of his insurance application. Pl.'s Opp. Mem., ECF No. 60, 4 ("Given the scope and thoroughness of his voluntary disclosures, and the unchallenged accuracy of them, it is inconceivable that he would have failed to disclose a 'blood/bleeding disorder' if anyone had ever told him he had such a malady."); *see Cont'l Cas. Co. v. Morris I. Olmer, LLC*, No. 3:08-CV-805 CFD, 2010 WL 3257673, at *4–5 (D. Conn. Aug. 10, 2010) (declining to conclude that plaintiff made a knowing misrepresentation as a matter of law because plaintiff had "stated that the statements on his application were 'true and accurate to the best of [his] ability at that time,' and had answered other questions correctly"); *Exantus v. Metro. Prop. & Cas. Ins. Co.*, 582 F. Supp. 2d 239, 246–47 (D. Conn. 2008) (concluding that a jury should decide whether the plaintiffs made knowing misrepresentations when the plaintiffs "d[id] not dispute that there were some inconsistencies in their reporting of the claims," but presented a version of events in which their misrepresentations were unintentional); *Minn. Lawyers Mut. Ins. Co. v. Lancia*, No. CV040412468S, 2006 WL 1229943 (Conn. Super. Ct. Apr.17, 2006) (insured's affidavit stating any incorrect answer was just an inadvertent mistake sufficient to create issue of fact for summary judgment); *Dias v.*

*Hermitage Ins. Co.*, No. 315371, 1997 WL 149777, at *2-3 (Conn. Super. Ct. Mar. 21, 1997) (denying summary judgment when the defendant insurance company had "not offered any evidence of the plaintiff's mental state" and therefore, "failed to demonstrate that the plaintiff knew that the representations were false when she made them.").

Mr. Cote said that he had not been treated for a "blood/bleeding disorder" and he had "reason to believe" that this was true." *Lewis*, 433 F. Supp. at 418.  A genuine dispute remains as to whether Mr. Cote misrepresented his answer to Question 3(h) and, if he did, whether he did so "knowingly."

The record in this case demonstrates genuine factual disputes about whether Mr. Cote made a "knowing misrepresentation" to his insurance company.  For these reasons, Defendant's motion for summary judgment should be DENIED.

### B. Plaintiff's Motion for Summary Judgment

Plaintiff argues that she is entitled to summary judgment because Mr. Cote's answer to Question 3(h) was "correct, honest, and devoid whatsoever of any knowing falsity" and Omaha had "no basis" for rescission.  Pl.'s Mem., ECF No. 57, 3, 9.  Specifically, Plaintiff argues that there is no genuine dispute about whether Mr. Cote's answer to Question 3(h) was honest because he and his doctors did not consider his anemia and thrombocytopenia to be a "blood disorder." *Id.* at 9.  The Court disagrees.  A reasonable jury could conclude that Mr. Cote made a "knowing misrepresentation" on his insurance form or did not use reasonable diligence to determine whether his answer to Question 3(h) was correct.

As discussed above, the record contains a genuine dispute of material fact as to how to interpret the term "blood/bleeding disorder" and whether the term was ambiguous.  Generally, the interpretation of a potentially ambiguous term in an insurance contract is a question of fact to be determined by the jury.  *Aetna Life & Casualty Co. v. Bulaong*, 218 Conn. 51, 59, 588 A.2d 138 (1991) ("[T]he interpretation of an insurance policy depends on factual questions."); *Lazar v. Metro. Life Ins. Co.*, 290 F. Supp. 179, 181 (D. Conn. 1968) (denying summary judgment when "the insured

insist[ed] his answer was within the framework of the question," leaving a question of fact as to whether his answer was knowingly misrepresented").

Another factual issue remains regarding Mr. Cote's duty to investigate the meaning of Question 3(h). Defendant argues that Mr. Cote did not use "reasonable diligence" to ensure that his answers were correct and should have contacted an Omaha representative after meeting with his doctors about his problematic blood tests, rather than "willfully ignor[ing]" his diagnoses. Def.'s Opp. Mem., ECF No. 62, 8-9 (citing *Mt. Airy*, 928 F. Supp. at 176).

Broadly-phrased insurance questions can trigger an applicant's duty to investigate whether his or her medical history triggers the question. *Corn v. Protective Life Ins. Co.*, No. 3-95-CV-556(WWE), 1998 WL 51783, at *5 (D. Conn. Feb. 4, 1998). In *Corn*, the court concluded that a plaintiff's claim of innocent misrepresentation was "unavailing" when the plaintiff's "medical records indicate[d]" a contrary conclusion. *Id.* "Given the breadth of the question at issue," the court reasoned, the plaintiff "should have realized that his treatment may have had an impact on the coverage under the policy." *Id.* Mr. Cote's medical records, like Corn's, suggest that he suffered from a blood-related condition that could have been understood as a "blood/bleeding disorder." Even if the Court were to assume that Question 3(h) was ambiguous, a reasonable jury could find that Mr. Cote knowingly misrepresented his answer to Question 3(h) because he improperly failed to investigate the meaning of "blood/bleeding disorder." Generally, "the question of whether a plaintiff exercised reasonable diligence is frequently a question of fact to be decided by a jury." *131 Main St. Assoc. v. Manko*, 179 F.Supp.2d 339, 349 (S.D.N.Y.2002). In this case, a jury should determine the ambiguity of the Policy application's terms and whether those terms triggered Mr. Cote's duty to investigate.

A reasonable jury could conclude that Mr. Cote made a knowing misrepresentation to United of Omaha. Plaintiff's motion for summary judgment therefore is DENIED.

## IV. Conclusion

Defendant's motion for summary judgment [Doc. No. 53] is DENIED. Plaintiff's motion for summary judgment [ECF No. 56] also is DENIED.

SO ORDERED at Bridgeport, Connecticut this 15th day of March 2017.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE